**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 08-2141**

———————————

JAMES PAUL PUGH, III,

              Plaintiff - Appellee,

      v.

LOUISVILLE LADDER, INCORPORATED, f/k/a Louisville Ladder
Group, LLC,

              Defendant – Appellant,

      and

HOME DEPOT U.S.A., INCORPORATED,

              Defendant.

———————————

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro. N. Carlton Tilley,
Jr., Senior District Judge. (1:06-cv-00656-NCT-PTS)

———————————

Argued: September 25, 2009      Decided: January 5, 2010

———————————

Before MOTZ and AGEE, Circuit Judges, and Mark S. DAVIS, United
States District Judge for the Eastern District of Virginia,
sitting by designation.

———————————

Affirmed by unpublished opinion. Judge Davis wrote the opinion,
in which Judge Motz and Judge Agee joined.

———————————

**ARGUED:** James Donald Cowan, Jr., ELLIS & WINTERS, LLP, Cary,
North Carolina, for Appellant. Vance Barron, Jr., Greensboro,

North Carolina, for Appellee. **ON BRIEF:** Andrew Chamberlin, Dixie T. Wells, ELLIS & WINTERS, LLP, Greensboro, North Carolina; Paul K. Sun, Jr., ELLIS & WINTERS, LLP, Raleigh, North Carolina, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

DAVIS, District Judge:

In this product liability diversity case, James Paul Pugh, III ("Pugh") alleged that a ladder manufactured by Louisville Ladder, Inc., ("LL") structurally failed during normal use, causing Pugh to fall and suffer injuries. At trial, two engineering experts testified on behalf of Pugh and the jury returned a verdict in Pugh's favor. LL filed the instant appeal arguing that the district court abused its discretion with respect to three evidentiary rulings. Finding no abuse of discretion, we affirm.

I.

A.

Excluding the few seconds during which Pugh fell from his ladder, the facts are undisputed. Pugh purchased an eight-foot LL ladder from Home Depot in March of 2003. The ladder was manufactured in Mexico in July of 2002 and had a "load capacity" of 225 pounds. Pugh read all of the warnings on the ladder label and the ladder showed no visible signs of damage at the time of purchase or at the time of use. After purchasing the ladder in March of 2003, Pugh hung it on hooks in his garage where it remained until July 10, 2003, when he used it for the first time.

On July 10, 2003, Pugh placed the ladder on his living room floor in order to install a skylight shade. At the time, Pugh

3

weighed 215 pounds and was carrying less than 10 pounds of tools while using the ladder. Pugh went up and down the ladder twice without incident. On Pugh's third trip up the ladder, he fell while standing on the ladder's sixth step. Pugh has no memory of the actual fall, but recalls later realizing that he was lying on the ground. When Pugh realized that he had fallen, he was dazed and disoriented and felt pain in his head, neck, and shoulders. Pugh was taken to the emergency room and was diagnosed with muscle strain and a concussion.

After Pugh's fall, his ladder evidenced extensive structural damage. The worst damage was located on each of the side rails, between the first and second steps on the left rail and between the second and third steps on the right rail. There were also visible cracks around and through the rivets connecting the first three steps to the side rails. After Pugh's ladder was thoroughly photographed and examined, experts for both parties agreed upon destructive testing to permit more complete examination. Upon microscopic examination at 1000x and 2000x power, Pugh's experts discovered "micro-cracks" at locations throughout the ladder, including at step seven, above the step being used by Pugh when the accident occurred.

The primary issue at trial was the manner in which Pugh's accident occurred. Pugh's theory was that his ladder had a manufacturing defect consisting of microscopic cracks at the

4

ladder's rivets and that, during normal use, such cracks propagated into larger cracks causing catastrophic failure/buckling that resulted in Pugh's fall. In contrast, LL's theory was that the ladder was not defective and did not fail, but that Pugh tipped the ladder during use and the ladder's post-accident severely damaged condition was caused during the accident when Pugh's body fell onto the ladder.

B.

Pugh filed the instant products liability action in North Carolina state court against LL and Home Depot. The defendants removed the action to the United States District Court for the Middle District of North Carolina. Both defendants moved for summary judgment, which was granted with respect to Home Depot but denied with respect to LL. Prior to trial, LL moved to exclude both of Pugh's proposed expert witnesses.

On April 28, 2008, the day before trial, the district court conducted a lengthy pre-trial motions hearing, and the majority of the hearing was spent on LL's motion to exclude Pugh's proposed experts: Dr. Ajit Kelkar ("Dr. Kelkar") and Dr. William Craft ("Dr. Craft"), professors of mechanical engineering at North Carolina A&T State University. At the pre-trial hearing, the court heard testimony from both Drs. Kelkar and Craft as well as LL's expert. LL conceded that Drs. Kelkar and Craft had

5

the education and expertise to testify on the subject at issue but challenged the reliability of their opinions.

At the conclusion of the pre-trial hearing, the district court denied LL's motion to exclude Pugh's experts. Although Drs. Kelkar and Craft were permitted to testify, the court granted a motion _in_ _limine_ filed by LL restricting Pugh's experts from testifying about testing performed on an "exemplar ladder" with the same LL model number as the accident ladder. The court excluded such testimony because the evidence established that LL had sold two differently designed ladders under this one model number. Because the accident ladder and the exemplar ladder had a different design, comparison of the specifications of one to the other was deemed to have no relevance.[1]

At trial, Dr. Kelkar testified at length during Pugh's case-in-chief regarding his theory of crack propagation leading to the catastrophic structural failure of Pugh's ladder. Dr. Craft did not testify during Pugh's case-in-chief but was

---

[1] Pugh's experts were unable to purchase a ladder with the same LL model number as the accident ladder since it was apparently no longer being sold in stores at the time of the lawsuit. By happenstance, Dr. Kelkar located a ladder with the same LL model number as the accident ladder at his Temple. Pugh's experts conducted testing on such ladder and discovered that its rails were thicker than the accident ladder. However, the variation in thickness was not indicative of a defect in the accident ladder due to the variation in designs.

6

reserved as a rebuttal witness.  LL objected to Pugh's decision to reserve Dr. Craft, but the district court overruled such objection.

During LL's presentation of its case, defense counsel attempted to introduce evidence to establish the absence of end-user complaints reporting "cracks" on LL ladders with the same model number as the accident ladder.  Pugh objected to such proposed evidence on hearsay grounds and, following a bench conference, the district court excluded such testimony based on its unreliability.

At the conclusion of the case, the jury returned a verdict in Pugh's favor.  LL filed the instant appeal challenging: (1) the denial of LL's motion to exclude the testimony of Drs. Kelkar and Craft; (2) the exclusion of testimony regarding the absence of end-user complaints reporting "cracking" of LL ladders with the same model number as Pugh's ladder; and (3) the ruling permitting Dr. Craft to be reserved as a rebuttal witness.  LL argues that the cumulative effect of the above stated errors denied LL a fair trial.

II.

District courts have broad latitude in determining the admissibility of evidence, and evidentiary rulings, including Daubert rulings, will not be overturned absent an abuse of

7

discretion.  Bryte ex rel. Bryte v. American Household, Inc., 429 F.3d 469, 475 (4th Cir. 2005).  "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law."  United States v. Delfino, 510 F.3d 468, 470 (4th Cir. 2007).  However, even if the district court abuses its discretion, such evidentiary ruling "is reversible only if it affects a party's substantial rights."  Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 310 (4th Cir. 2006); see Fed. R. Evid. 103(a).

A.

Federal Rule of Evidence (FRE) 702 acts as the guidepost for the admissibility of expert testimony.  United States v. Wilson, 484 F.3d 267, 274-75 (4th Cir. 2007).  The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In considering the admissibility of expert testimony, a district court acts as a gatekeeper and must assess

8

whether an expert's proffered testimony is both sufficiently reliable and relevant. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006). The relevance and reliability of expert testimony is examined through consideration of, among other things: "(1) whether the particular scientific theory 'can be (and has been) tested'; (2) whether the theory 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error'; (4) the 'existence and maintenance of standards controlling the technique's operation'; and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community." United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993)).

Although reliability of an expert's principles and methods, as well as the application of the facts to such methods, must be examined by the district court, the court "need not determine that the proffered expert testimony is irrefutable or certainly correct," since, like all forms of testimony, "expert testimony is subject to testing by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" Moreland, 437 F.3d at 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596) (alteration in original); see also Maryland Casualty Co. v. Therm-O-Disc,

9

Inc., 137 F.3d 780, 784 (4th Cir. 1998) (noting that "[a]ll Daubert demands is that the trial judge make a 'preliminary assessment'" of whether the proffered testimony is both reliable and helpful). Neither FRE 702 nor case law establish a mechanistic test for determining the reliability of an expert's proffered testimony; on the contrary, "'the test of reliability is flexible' and 'the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" Wilson, 484 F.3d at 274 (quoting Kumho Tire Co., 526 U.S. at 141-42) (second emphasis added).[2] Although the district court is afforded broad latitude in performing such flexible inquiry, the focus of the inquiry should be on the "'principles and methodology' employed by the expert, not on the conclusions reached." Moreland, 437 F.3d at 431 (quoting Daubert, 509 U.S. at 594-95) (emphasis added).

---

[2] As recognized in Wilson, a district court's reliability determination "does not exist in a vacuum," and there are "meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." Wilson, 484 F.3d at 274. Here, it appears that some of Pugh's experts' testimony was based on post-accident testing and some was "experiential in nature." For example, Dr. Kelkar testified that, based on his years of experience working with NASA, numerous branches of the military, and several private companies, he knows that punching a hole in any metal in order to install a rivet weakens the metal and that crack propagation from rivets in metals is a widely accepted phenomenon.

10

Here, LL argues both that the district court failed to properly perform its role as gatekeeper and that the testimony of Pugh's experts was not based on sufficient facts or data. The latter of these arguments focuses on the contention that Pugh's experts failed to apply their "principles and methods reliably to the facts of the case." Fed. R. Evid. 702(3).

1.

The Court first considers LL's contention that the district court did not properly perform its role as gatekeeper because the court purportedly shifted the expert admissibility burden to LL. We begin consideration of this argument by noting that the proponent of expert testimony does not have the burden to "prove" anything, but must "come forward with evidence from which the court can determine that the proffered testimony is properly admissible." Maryland Casualty, 137 F.3d at 784.

LL's burden argument ignores the context of its challenge to Pugh's experts and is only supported by the record if excerpts from the lengthy Daubert hearing are viewed in isolation. LL began its argument at the Daubert hearing by acknowledging the "many articulations" of the Daubert standard and clarifying that the burden to establish the admissibility of expert testimony was on Pugh. LL then argued that expert testimony should not be admitted if it is based on "assumptions or beliefs, if the witness has failed to consider other

11

explanations, or if the witness's theory is easily falsifiable with a single counter example." (J.A. 452.) LL stated that the reason the testimony should be excluded in this case is that "[w]e have a failure to test. We have opinions based on assumptions. We have failure to consider other explanations, and we have an easily falsifiable theory . . . ." (Id.) LL's subsequent argument did not focus on attacking the "principles and methodology" employed by Pugh's experts, but instead focused on why their conclusions were incorrect, i.e. "easily falsifiable."

During LL's counsel's summary of why principles of physics would disprove Pugh's experts' theory, the court interjected, stating: "You're saying it's physically impossible [for the buckling] to happen like [Pugh's experts opine]?" (Id. at 457.) Counsel responded: "It is. Jumping ahead, Your Honor, it didn't happen like that." (Id.) After the court confirmed that LL's "impossibility" claim was being advanced in an effort to exclude the testimony of Pugh's experts, the following exchange occurred:

> **LL Counsel:** Your Honor, I'm careful to point out, that the burden on the Plaintiff is to prove by a preponderance of the evidence, that the testimony is reliable and that the testimony has employed reliable scientific methodology.
> **Court:** They don't have to prove the opinion is reliable.
> **LL Counsel:** They have to prove the reliability of the method and contrary wise it's not the

|           | Defendant's burden to prove that the opinion is impossible. |
|-----------|---|
| **Court:** | Well, if you want to exclude it, it seems to me, that you need to show me scientifically, why that is physically impossible or highly unlikely, because <u>if they applied proper methodology</u>, and their opinion is wrong, isn't that for the finder of fact to determine? |

(J.A. 457-58) (emphasis added).   LL highlights this statement by the district court, among others, in an effort to establish that the court improperly shifted the burden to LL and/or improperly applied an "impossibility" standard.

After considering the Daubert hearing transcript in its entirety, we find that LL fails to establish that the district court erroneously shifted the burden of production to LL or otherwise failed to exercise its role as gatekeeper.[3]   Although LL had referenced purported errors in Pugh's experts' methodology prior to the above quoted exchange, LL's argument had focused almost entirely on the contention that Pugh's

---

[3] Although LL's claims of error before this court focus solely on the Daubert hearing, we recognize that the district court had additional evidence before it supporting the admissibility of Pugh's experts' testimony, such as a joint affidavit submitted by Drs. Kelkar and Craft with numerous exhibits including engineering formulas, published articles, and "expert reports" detailing the testing Drs. Kelkar and Craft performed in this case.   The fact that the district court had such materials prior to the Daubert hearing further explains the manner in which the hearing was conducted, i.e. LL was given an opportunity to attack Pugh's prior assertions in support of the admissibility of his experts.

13

experts' conclusions were readily falsifiable. The district court's statement regarding impossibility/unlikelihood, taken in context, appears to be a response to such repeated attacks on Pugh's experts' conclusions. Furthermore, a careful examination of the statement made by the district court regarding the correctness of an expert's conclusions reveals that the court was following this Court's instruction to focus on the experts' "principles and methodology" and not on the conclusions reached. Moreland, 437 F.3d at 431.[4] Tellingly, the court's statement was limited to a situation where a challenged expert had applied "proper methodology."

Further supporting the above finding, prior to the lunch recess from the lengthy Daubert hearing, the district court attempted to redirect LL's focus for the remainder of the hearing, stating that counsel was continuing to argue that it

---

[4] The Supreme Court has recognized that "conclusions and methodology are not entirely distinct from one another" and that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Such holding, however, does not shift the focus of the Daubert test to experts' conclusions, but merely clarifies that the district court's broad discretion includes the discretion to find that there is "simply too great an analytical gap between the data and the opinion proffered." Id. Our recent decision in Moreland, decided after Joiner and the 2000 amendments to Rule 702, reiterates the fact that the proper focus remains on the expert's "principles and methodologies." Moreland, 437 F.3d at 431.

14

was "scientifically impossible" for the ladder to fail in the manner claimed by Pugh's experts and that the focus should be on the validity of the scientific methods utilized and not on the weight of such testimony — which is a question for the jury. (J.A. 552-53.)  After the lunch recess, the court again repeated its concern, stating:

> But now share with me, if you would, [counsel], where you are with regard to scientific methodology.  It sounds to me like what you are doing is cross-examination with regard to the weight of [Pugh's expert's] opinion, and not the validity of his opinion and, you know, this is not a free deposition or free opportunity for cross-examination.

(J.A. 592-93.)  After a brief exchange that concluded with LL's counsel's offer to end his questioning the court responded: "If you have other questions that go to the methodology, you certainly should ask them . . . ."  (Id. at 594.)

We therefore find that the district court did not impose an improper burden on LL nor otherwise abuse its discretion in the manner in which it conducted the Daubert hearing.  See Maryland Casualty, 137 F.3d at 784 (declining to reverse the district court's Daubert ruling notwithstanding the court's incorrect statement regarding the burden, made at the beginning of the Daubert hearing, because "the general process contemplated by Daubert took place in the hearing and . . . [the plaintiff] squarely bore the burden of production").

2.

LL next argues that even if the district court appropriately performed its role as gatekeeper, Pugh's experts should not have been permitted to testify because they failed to apply their "principles and methods reliably to the facts of the case." Fed. R. Evid. 702(3). We acknowledge that such contention presents a close question. However, on such a close discretionary ruling we may not substitute our judgment for that of the district court. United States v. MacDonald, 688 F.2d 224, 228 (4th Cir. 1982).

Although Pugh's experts' initial conclusion, that the ladder failed structurally, was based solely on a visual inspection of the post-accident ladder, such experts thereafter performed several tests to support their initial assessment. These tests included: (1) testing to rule out a design defect;[5] (2) "non-destructive" testing, including labeling, measuring, and photographing the accident ladder;[6] (3) destructive testing, whereby samples were cut from the ladder's side rails and

---

[5] Pugh's experts freely admitted that the accident ladder's design was more than sufficient to support its rated 225 pounds.

[6] Visible cracks were apparent on the edge of the rivets and were fully propagated through the flange of the side rails in the area where the ladder was deformed and Pugh's experts testified that the paths of such cracks were consistent with structural failure.

16

submitted for testing to a third-party facility; (4) fractographic examination of the side rails and rivets using a high magnification optical microscope and a scanning electron microscope;[7] (5) using "standard engineering formulas" to determine that fully propagated cracks would have resulted in a substantial reduction of the "moment of inertia" of the side rails, which would in turn decrease the rails' load capacity; and (6) testing C-shaped sections of aluminum designed to mimic the accident ladder's side rails whereby mock rivet holes were drilled, cracks simulated, and the reduced load capacity tested - such testing was videotaped which permitted peer review.[8]

---

[7]    Dr. Kelkar represented that this was a standard engineering technique to identify pre-failure fracture mechanisms, and Dr. Kelkar's qualification in the field of fracture mechanics went unchallenged by LL. (J.A. 364-65.) In 1985 Dr. Kelkar obtained his Ph.D. devoted entirely to fracture mechanics, particularly in the area of failures due to fractures that can be caused by impact. (Id. at 508.) Dr. Kelkar has worked for NASA, the Air Force, Army, and Navy, and authored over 200 publications. He has also worked on several rivet studies and is an engineer for a school bus company for which he helped develop a new design aimed at eliminating cracks in manufacturing due to the riveting process. (Id. 507-10.)

[8]    According to engineering publications cited by Pugh's experts, (J.A. 364), a hole in a structure acts as a "stress riser" and cracks initiate at points of high stress concentration, such as rivets. Pugh's experts' testing revealed that micro-cracks existed around the rivet holes on the upper side rails of the accident ladder above the step where a load had been placed on the ladder by Pugh. Pugh's experts contended that cracks at this location supported their hypothesis that the cracks pre-dated the accident since weight applied below such step would not cause such cracks. LL's counsel failed to impugn (Continued)

Based both on their experience and the testing outlined above, Pugh's experts determined that their structural failure theory was scientifically supported by the facts of this case and the most likely cause of the accident.

In addition to testing and analysis supporting their crack propagation theory, Pugh's experts performed testing and analysis to disprove the opposing theory – impact damage. Based on their experience, Pugh's experts testified at the Daubert hearing that a blunt object, like a human's upper torso, falling onto an aluminum ladder could not create the buckling damage readily observable on the accident ladder. See Kumho Tire Co., 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). To prove such conclusion through testing, Pugh's experts conducted impact testing by dropping a mass weighing 240 pounds, roughly in the human form, on a similar 6 foot aluminum ladder. Such impact testing, which was videotaped and thus subject to peer review, purportedly established that the damage apparent on the accident ladder could not have been caused by a person falling onto the ladder. Cf. Oglesby v. General Motors Corp., 190 F.3d 244, 250 (4th Cir.

---

Pugh's expert's reliance on such cited sources at the Daubert hearing.

18

1999) (recognizing deficiencies in the plaintiff's expert's testing/analysis including the expert's failure to "eliminate other equally plausible causes" for the failure of the component in question).

Notwithstanding the tests outlined above, LL highlights several alleged deficiencies with Pugh's experts' conclusions, including the experts' failure to investigate the manufacturing process, failure to analyze the likelihood that micro-cracks would propagate based on aluminum's physical properties, failure to perform computer modeling, failure to definitively establish whether the micro-cracks pre-dated the accident, and failure to advance direct proof that micro-cracks occurred during manufacturing.[9]    However, in light of the testing that was performed to both support Pugh's hypothesis and discredit LL's

---

[9] Pugh's experts consistently reported that due to the accident ladder's severely damaged state it was impossible to conclusively determine the precise manner in which it failed, but that the testing performed to support their theory and rule out LL's theory established that their theory was the most probable scientific explanation.    We are unpersuaded by LL's contention that Dr. Craft admitted that tests could have been performed to establish whether any cracks pre-dated the accident.    Dr. Kelkar stated that "for this particular ladder" he could not "metallurgically or microscopically" put a date on the cracks.    (J.A. 546.)    Dr. Craft's later statement, that "it might be possible under certain conditions" to date a crack based on chemical or dirt infiltration, merely acknowledges the possibility of such testing under hypothetical facts and does not appear to be a concession that such tests were viable on these facts.    (J.A. 596-97.)

19

hypothesis, and the lack of evidence suggesting that any of such testing was unreliable, the alleged failure of Pugh's experts to perform additional testing goes more to the weight of the expert testimony than to its Daubert admissibility. See Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999) (indicating that alternative causes for a medical diagnosis advanced by a defendant go to the weight of a medical expert's opinion, not its admissibility, as long as the plaintiff's expert took "serious account of other potential causes" in formulating a diagnosis); Schmude v. Tricam Indus., 556 F.3d 624, 625-26 (7th Cir. 2009) (rejecting the defendant's claim of error regarding the plaintiff's expert's failure to perform testing that replicated a ladder's collapse and noting that the defendant failed to establish what kind of test would prove whether the hypothesized cause for the collapse was correct).

LL therefore fails to establish that the testing outlined above, along with "experiential" testimony offered by Drs. Kelkar and Craft, was not sufficiently relevant, reliable, and based on the facts of this case.[10]  Accordingly, we decline to disturb the district court's determination, made after a lengthy

---

[10] In explaining its Daubert ruling, the district court expressly referenced Pugh's experts' experiential testimony, their testing in support of Pugh's theory, and their explanation as to why impact damage was not supported by the facts of this case.  (J.A. 610-11.)

<u>Daubert</u> hearing, that Pugh's experts were permitted to present their opinions to the jury where the weight of such opinions would be tested though "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"    <u>Moreland</u>, 437 F.3d at 431 (quoting <u>Daubert</u>, 509 U.S. at 596).

B.

LL next challenges the district court's ruling excluding testimony regarding the absence of end-user complaints reporting "cracking" of LL ladders with the same model number as Pugh's ladder. At trial, a LL safety engineer testified that LL had a system in place for documenting and tracking incidents/accidents reported to LL by end users. After establishing that LL recorded all customer complaints and criticisms about its ladders, the following exchange occurred:

| | |
|---|---|
| **LL Counsel:** | Now, before Mr. Pugh came along with this particular claim in the 85,000 ladders that you sold of this model, did anyone make any kind of claim that the ladder they purchased <u>had cracked</u> and was just unable to hold a user's weight? |
| **Pugh Counsel:** | Objection. |
| **Court:** | In that fashion, yes. |
| **LL Counsel:** | Did anybody claim that their L2211-08S <u>had cracks</u> in it? |
| **Pugh Counsel:** | Objection. |
| **Court:** | Approach the bench. |

(J.A. 1418) (emphasis added).

During the bench conference, Pugh immediately indicated that his objection was based on hearsay. LL responded by citing the hearsay exception set forth in FRE 803(7). Such rule states that the following evidence is not excluded by the hearsay rule:

> Evidence that a matter is not included in the memoranda reports, records, or data compilations, in any form, kept in accordance with the provisions of [the business records exception set forth in] paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(7).

After hearing from both parties, the district court sustained Pugh's objection to the specific "cracking" question posed, not because LL's business records were deemed to fall outside of FRE 803, but because the court found that the proffered testimony had "no reliability" based on the phrasing of the question asked to the witness. (J.A. 1439.) The challenged question asked whether LL received customer complaints about LL ladders that "had cracked." The court concluded that a lay person would simply not identify a structural failure, resulting in a post-accident ladder in a similar condition to Pugh's ladder, as a "cracking" failure.

Applying the deferential abuse of discretion standard, we again conclude that overturning the district court's ruling

22

would invade the broad discretion afforded the district court and require this court to substitute its judgment for that of the district judge.   FRE 803(7) permits the introduction of the absence of a business record to prove the nonoccurrence of an event "unless the sources of information or other circumstances indicate lack of trustworthiness."   Fed. R. Evid. 803(7) (emphasis added).   While the district court used the word "reliability" and not "trustworthiness," the court's rationale for excluding the testimony was not an abuse of discretion as the district court provided adequate justification for finding that "other circumstances" rendered the proffered testimony untrustworthy.

Alternatively, even if we found that "unreliability" was an insufficient basis to exclude testimony reporting the lack of "cracking" complaints, a separate ruling made by the district court provides an independent basis for the exclusion of such testimony.[11]   After the district court made the reliability ruling discussed above, the court excluded LL's proffered testimony regarding six customer complaints it received that were unrelated to "cracking."   The court excluded such testimony regarding these "non-cracking" complaints because LL failed to

---

[11] Such independent basis for excluding testimony discussing the lack of "cracking" complaints is unchallenged on appeal.

produce/introduce as a trial exhibit the business records documenting such complaints. The court explained that such testimony would not be permitted in the absence of the documents because opposing counsel cannot counter testimony regarding the contents of documents he has never seen. Although the district court's analysis supporting such ruling focused on the exclusion of the six complaints LL <u>actually received</u>, the ruling is broad enough to act as an alternative justification to bar testimony about the cracking complaints that were purportedly <u>not received</u>. To clarify, if the failure to produce/introduce the pertinent business records barred testimony about what the business records actually stated, it surely barred testimony about what the same records <u>did not</u> state since the only way to prove the negative—no cracking complaints—is to consider the contents of the complaints actually received. Accordingly, LL's failure to introduce its business records provides an independent justification for excluding testimony discussing the lack of "cracking" complaints.

## C.

LL's third evidentiary challenge contends that the district court erred by permitting Pugh's second expert, Dr. Craft, to be reserved as a rebuttal witness. FRE 611(a) states that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1)

24

make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a). Notwithstanding the court's discretion regarding witness order, "[o]rdinarily, rebuttal evidence may be introduced only to counter new facts presented in the defendant's case in chief." Allen v. Prince George's County, Md., 737 F.2d 1299, 1305 (4th Cir. 1984).

Here, prior to resting, Pugh's counsel informed the court that Pugh intended to reserve Dr. Craft for rebuttal in order to speed along the presentation of the evidence. No objection to such proposal was initially made by LL. (J.A. 1083.) Thereafter, LL objected to the reservation of Dr. Craft, contending that a rebuttal witness should only be allowed to testify as to "things that are surprise or unexpected . . . ." (Id. at 1155-56.) The district court made no immediate ruling on such objection, but later overruled the objection, indicating that rebuttal would not be limited to surprise evidence. (Id. at 1302.)

Prior to Dr. Craft's testimony, the district court again allowed LL to argue against the reservation of Dr. Craft. The court, having reviewed the case law cited by LL, reaffirmed its earlier ruling and indicated that rebuttal testimony was appropriate as long as it "clarifies, rebuts or explains or

disproves or goes to disproving or explaining [or] clarifying the testimony of [LL's witnesses]." (Id. at 1399.) The court rejected LL's contention that Dr. Kelkar already fully challenged LL's expert's position during Pugh's case-in-chief, indicating that a plaintiff's expert "can only anticipate so much of what the defense evidence is going to be . . . ." (Id. at 1399-400.)

After reviewing the trial transcript, we find that LL fails to establish that the district court abused its broad discretion in exercising control over the "mode and order of interrogating witnesses." Fed. R. Evid. 611(a). LL fails to establish that precedent requires a district court to limit rebuttal to surprise evidence – the fact that we have previously held it within a district court's discretion to limit rebuttal to surprise evidence does not equate with a requirement that rebuttal must always be limited in such manner. See Hospital Bldg. Co. v. Trustees of Rex Hosp., 791 F.2d 288, 294 (4th Cir. 1986) (finding no abuse of discretion under the circumstances where the district court limited rebuttal to surprise evidence in light of the fact that plaintiff took ten weeks to present its case-in-chief). The Court's decision in Allen, relied on by LL, is likewise distinguishable from the instant case since Allen involved the rejection of the plaintiff's attempt to introduce new data on rebuttal in support of a new trial

26

strategy not pursued as part of the plaintiff's case-in-chief.
Allen, 737 F.2d at 1305.  On the facts before this Court, the
district court did not abuse its discretion by declining to
limit rebuttal evidence to a response to LL's "surprise"
testimony, nor did the district court abuse its discretion in
permitting Dr. Craft to testify for the first time on rebuttal.[12]


III.

We conclude that the district court did not abuse its
discretion with respect to any of the challenged evidentiary
rulings.    Finding no abuse of discretion, we reject LL's

---

[12] LL also appears to argue, primarily in its reply brief,
that Dr. Craft's actual testimony was improper because it was
non-responsive to LL's evidence and was merely rehashing what
should have been previously presented.  However, such objection
was not preserved below.  In rejecting LL's preemptive challenge
to the reservation of Dr. Craft, the district court expressly
invited LL's counsel to object during Dr. Craft's testimony if
Dr. Craft started to "rehash what could have been said earlier .
. . ."  (Id. at 1399.)  A review of Dr. Craft's testimony
reveals that LL's counsel did not once object to the scope of
the inquiry during Dr. Craft's testimony.  (Id. at 1525-61.)  We
therefore do not find any error regarding the "responsiveness"
of the testimony actually elicited as the district court was
never presented an objection once the scope of Dr. Craft's
testimony became clear.  See United States v. Smith, 452 F.3d
323, 330 (4th Cir. 2006) (recognizing that although motions in
limine often suffice to preserve objections for appeal, such
is not the case when "the exact nature" of the error complained of
cannot be known at the time the motion is decided); United
States v. Williams, 81 F.3d 1321, 1325 (4th Cir. 1996) (finding
a motion in limine insufficient to preserve an objection when
the motion was not based on the "precise issue" later raised).

argument   regarding   the   "cumulative   effect"   of   the   alleged

errors.   Accordingly, we affirm.

<u>AFFIRMED</u>

28